OPINION *Page 2 
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Defendant-Appellant, Kelly Carter, appeals the decision of the Jefferson County Court of Common Pleas, that found Carter guilty of aggravated murder, murder, complicity to murder, and two counts of felonious assault, and firearm specifications for the killing of Alfred Wade, Jr. Carter raises multiple issues, ranging from evidentiary issues to possibly jury and prosecutorial misconduct to his counsel's effectiveness. Each of these arguments is meritless and Carter's conviction is affirmed.
 Facts {¶ 2} On August 5, 2001, Xuan Sayles broke into the apartment of Shane Robinson, beat Robinson's stepfather, Vernon Thurman, shot Robinson's brother, Shiraz, and robbed the apartment. Xuan Sayles is a cousin of Terrell Sayles and Wade. Robinson was upset about the robbery and the assault on his brother and he and his friend, Carter, believed that Terrell Sayles and Wade either had something to do with the robbery or had some form of control over Xuan. During the course of the month of August 2001, many people witnessed a rising in tensions between these two groups and on many occasions, Robinson and Carter stated that they wanted both to be repaid for what they lost in the robbery and revenge for the shooting of Robinson's brother.
 {¶ 3} On August 27, 2001, Robinson and Carter were at a bar in Steubenville, Ohio, the Safari Lounge, with a group of their friends. Wade was also at the Safari Lounge with a group of his friends. At one point during the evening, Carter was overheard saying that he would like to kill everybody in Wade's group of friends. Robinson and Carter left the Safari Lounge before Wade and a mutual friend warned Wade that he had a feeling that Carter and Robinson may do something bad that night. When Wade drove home in the early hours of August 28, 2001, he was met by Carter and Robinson. He got into an altercation with them and they shot him multiple times. Wade was dead by the time emergency medical personnel responded to the scene.
 {¶ 4} There were three eyewitnesses to the shooting, Demetrius Birden, a cousin of Wade's who was later murdered in an unrelated incident, Carl Williams, and Tina, an *Page 2 
unidentified Caucasian girl. Williams, a convicted felon who was testifying in an attempt to cooperate with federal authorities, testified that he saw the entire altercation in front of Wade's home.
 {¶ 5} Carter was indicted for the murder of Wade on June 3, 2004. The indictment charged Carter with aggravated murder, complicity to aggravated murder, murder, complicity to murder, and two counts of felonious assault and complicity to felonious assault. Each of these charges also contained a firearm specification. The indictment was later amended on July 19, 2004. The same charges were filed against Robinson. Carter and Robinson retained the same counsel to represent them against these charges.
 {¶ 6} On January 12, 2005, the State made a plea offer to Carter. That offer proposed that Carter plead guilty to one count of felonious assault in exchange for testifying against Robinson. At two separate hearings, the trial court urged Carter to obtain the services of separate counsel to advise him on whether to accept this plea since his current counsel represented both he and Robinson. The trial court offered to appoint separate counsel to Carter for this purpose. Carter turned down the offer of separate counsel, refused to discuss the matter with new counsel, and rejected the State's plea offer.
 {¶ 7} The matter proceeded to a jury trial on February 1, 2005. During that trial, defense counsel's main strategy was to discredit the testimony of the State's only eyewitness, Williams, by using witnesses who testified that he was not in Steubenville on the date in question. In rebuttal, the State called a witness who testified that Robinson bribed one of the defense witnesses who testified that Williams was in Chicago during August 2001, not Steubenville. After deliberation, the jury found Carter guilty of all counts. The trial court then sentenced Carter to twenty-three years to life.
 Jury Misconduct {¶ 8} In his first of seven assignments of error, Carter argues:
 {¶ 9} "The trial court erred when it failed to declare a mistrial after the impartiality of the jury was compromised when jurors discussed and considered information outside *Page 3 
the record in violation of the Appellant's Fifth Amendment right to be tried and convicted only on the evidence presented at trial and of record and his Sixth Amendment right to an impartial jury."
 {¶ 10} Carter maintains that he was prejudiced by the fact that one juror, during the course of the trial, discovered he knew one of the defense witnesses and told the rest of the jury that he was afraid of retaliation if they returned a guilty verdict. Carter claims the trial court was obligated to question each juror regarding whether this information would influence their decision, which it did not do.
 {¶ 11} In this case, a juror informed the trial court during deliberations that he was uncomfortable with the possibility of a guilty verdict since he knew a defense witness. The jury's note to the trial court stated:
 {¶ 12} "Juror realized during the testimony that he was familiar with Blake Thompson. Blake resided at the same complex (apt) within the last year. Juror did not know his name. Juror feels uncomfortable with possibility of defendants receiving a guilty verdict. Blake does recognize Juror as he has spoken to him in Hallway."
 {¶ 13} After receiving this note, the trial court spoke to the juror in question. He stated that he recognized "quite a few of the audience members" and was feeling "paranoid" about the possibility that he may be retaliated against if there was a guilty verdict. He stated that he voiced these concerns to the other jurors. However, when asked by the court whether he could put these concerns aside and decide the case based on the available evidence, the juror stated that he could do so. After the trial court questioned the juror, defense counsel objected, claiming that he believed the jury was no longer competent to give a verdict.
 {¶ 14} "An accused is entitled to a trial before an impartial, unprejudiced, and unbiased jury." State v. Daniels (1993),92 Ohio App.3d 473, 486. This right is guaranteed by both the Ohio and United States Constitutions. State v. Jaryga, 11th Dist. No. 2003-L-023, 2005-Ohio-0352, at ¶ 72. A jury's verdict must be based solely on the evidence and argument presented in open court, not on any outside influence. Patterson v. Colorado (1907), 205 U.S. 454, 462; see alsoSmith v. Phillips (1982), 455 U.S. 209, *Page 4 
217 ("Due process [requires] a jury capable and willing to decide the case solely on the evidence before it.").
 {¶ 15} This and other district courts of appeals have, in the past, presumed prejudice when a criminal defendant has proven juror misconduct. See State v. Hood (1999), 132 Ohio App.3d 334, 338;State v. Spencer (1997), 118 Ohio App.3d 871, 873; State v. King (1983),10 Ohio App.3d 161, 165. However, the Ohio Supreme Court specifically rejected a presumption of prejudice in this situation in State v.Keith, 79 Ohio St.3d 514, 526, 1997-Ohio-0367, when it "reaffirmed a long-standing rule that a court will not reverse a judgment based upon juror misconduct unless prejudice to the complaining party is shown." See also State v. Adams, 103 Ohio St.3d 508, 2004-Ohio-5845, at ¶ 42, 45 ("[T]he party complaining about juror misconduct must establish prejudice."). Thus, the party making a claim of juror misconduct must first prove misconduct and then prove that they were prejudiced by that misconduct. Jargya at ¶ 75.
 {¶ 16} Trial courts are given broad discretion when dealing with allegations of juror misconduct. Keith at 526-527. Thus, its decision when faced with such allegations must be reviewed for an abuse of discretion. Id. at 528. "The term `abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v.Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 17} Carter argues that the juror was biased because he was concerned for his safety if the jury rendered guilty verdicts. However, "[a] juror's concerns for safety, standing alone, are not sufficient to warrant a new trial." State v. Garcia, 8th Dist. No. 79917, 2002-Ohio-4179, at ¶ 86. The party alleging juror misconduct must still prove bias. Id. Thus, the fact that a juror worked in a high-crime area and was afraid the defendant's family knew him did not prove that he was biased. Id. Likewise, the fact that jurors felt like they were followed when out to lunch and were concerned about the defendants' access to the personal information on the jury questionnaires did not prove bias.Daniels at 487.
 {¶ 18} In this case, Carter has not proven that any member of the jury was biased *Page 5 
as a result of the juror in question's concerns. The juror in question told the judge that he could decide the case based on the fact presented at trial. Furthermore, his concerns, if they did influence him at all, would have made him more likely to find Carter not guilty, rather than guilty. We cannot conclude that the trial court abused its discretion when it overruled Carter's motion for a mistrial at this stage in the proceedings.
 {¶ 19} Finally, Carter suggests that the trial court should have conducted a more thorough investigation into juror bias by questioning each juror individually to see if the juror's concerns affected them in any way. However, "the scope of voir dire is within the discretion of the trial court and varies depending on the circumstances of each case."State v. Williams, 79 Ohio St.3d 1, 5, 1997-Ohio-0407. In this case, the trial court spoke to the juror in question about his concerns. He then told the jury as a whole that the matter had been dealt with. The trial court did not abuse its discretion by not questioning each juror, especially in the absence of a request to do so by the defense.
 {¶ 20} For these reasons, the arguments within Carter's first assignment of error are meritless.
 Prosecutorial Misconduct {¶ 21} In his second assignment of error, Carter argues:
 {¶ 22} "The prosecutor's pervasive misconduct during the course of the Appellant's entire trial denied the Appellant his right to a fair trial and due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution and merits a reversal of Appellant's convictions and a new trial."
 {¶ 23} The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. State v.Fears, 86 Ohio St.3d 329, 332, 1999-Ohio-0111. In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected substantial rights of the appellant. State v. Smith (1984),14 Ohio St.3d 13, 14-15. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v. Hanna,95 Ohio St.3d 285, 2002-Ohio-2221, at ¶ 61, quoting Smith, *Page 6 455 U.S. at 219. An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128, at ¶ 121. A failure to object to alleged prosecutorial misconduct waives all but plain error. Hanna at ¶ 77; LaMar at ¶ 126.
 {¶ 24} Because Carter argues the prosecutor committed misconduct in a variety of different ways, we will address each of his claims in turn.
 Witness Tampering {¶ 25} Carter argues that the prosecutor committed misconduct by arguing that Carter was guilty of murder because of evidence that Robinson had both offered to buy and actually bought the testimony of certain witnesses. He contends that these acts are inadmissible as evidence against him since there is no indication that he knew of or authorized those offers or payments and that their introduction is simply an attempt to tarnish him through the discredited doctrine of guilt by association.
 {¶ 26} Carter is correct that evidence that an attempt by a third-party to bribe or otherwise influence a witness is generally inadmissible against a defendant. State v. Smith (1990),49 Ohio St.3d 137, 143; State v. Walker (1978), 55 Ohio St.2d 208, 215; Mefford v.State (1920), 13 Ohio App.106, 107. However, such evidence is admissible if the State can prove the defendant knew of or authorized such an attempt. Id. If two co-defendants are tried together and the State introduces evidence that a co-defendant bribed a witness, but does not prove that the defendant knew of the bribery attempt, then the trial court errs if it does not grant a mistrial to the defendant, unless the evidence of the defendant's guilt is overwhelming. Smith; State v.Nicholson, 8th Dist. No. 84527, 2005-Ohio-1703.
 {¶ 27} Courts from other states have held that there is sufficient circumstantial evidence that a defendant knew and approved of an attempt to influence a witness if the defendant was present during such an attempt. See Saunders v. State (Fla. 1989), 547 So.2d 193; Bennett v.Commonwealth (1917), 175 Ky. 540, 194 S.W. 797. However, no Ohio court has yet been faced with such a situation. *Page 7 
 {¶ 28} In this case, the prosecutor elicited testimony showing that Robinson both attempted to and actually bribed witnesses. However, he did not introduce any evidence showing that Carter knew about or approved of those attempts. Nevertheless, we cannot conclude that the prosecutor committed misconduct when asking these questions.
 {¶ 29} First, evidence that tends to demonstrate the attempted bribery of a witness by a defendant is admissible against that defendant since such an attempt is an admission of guilt. State v. Hunt, 8th Dist. No. 84528, 2005-Ohio-1871, at ¶ 8. Thus, it was completely proper for the prosecutor to inquire into Robinson's attempts at bribery since Robinson was a defendant at trial.
 {¶ 30} Furthermore, the prosecutor may have been able to prove that Carter either knew or approved of Robinson's bribery attempts. If he had such proof, such as Carter's presence during the bribery attempts, then evidence of Robinson's bribery attempts would be admissible against Carter. See, generally, Admissibility in criminal case, on issue of defendant's guilt, of evidence that third person has attempted to influence a witness not to testify or testify falsely, 79 A.L.R.3d 1156. Likewise, the prosecutor may have had a good faith basis for asking these types of questions. Such evidence was not introduced because defense counsel did not raise the issue. Finally, the prosecutor may have reasonably believed that any harm to Carter would be mitigated by a curative instruction by the trial court if Carter had objected to the introduction of this testimony. For instance, the First Circuit has held that any risk of prejudice in this type of testimony is cured by an instruction that the jury is not to consider the testimony in any manner as to the defendant. U.S. v. Colon-Munoz (1st Cir.1999), 192 F.3d 210.
 {¶ 31} Thus, we cannot conclude that the prosecutor committed misconduct by asking these questions for many reasons. Accordingly, Carter's prosecutorial misconduct argument with regard to questions about witness tampering is meritless.
 Birden's Failure to Appear for Rebuttal {¶ 32} Carter next argues that the prosecutor committed misconduct when it improperly discredited Birden's testimony in the eyes of the jury by highlighting the fact that she did not appear to testify on rebuttal in contravention of a court order that she do *Page 8 
so.
 {¶ 33} In its cross-examination of Birden, the State asked her whether she received a certain phone call and whether she would be surprised if there was a recording of that phone call. After asking these questions, the prosecutor informed the trial court at a sidebar that it had a copy of this tape, but did not wish to play it at this time. Instead, the prosecutor stated that he preferred to recall Birden on rebuttal and play the tape at that time. The trial court then excused Birden from the witness stand, but told her "I think you're going to be recalled. So, we need for you to stay," to which Birden replied, "Okay."
 {¶ 34} At the end of the day, the prosecutor asked to ensure that the defense witness which he planned to call the next day in rebuttal knew that they should appear. The trial court asked if Birden was still present, since it had specifically told her to stay. Defense counsel informed the trial court that she was not in the hall and the prosecutor speculated that she must have left. The prosecutor asked the trial court if it felt that he should subpoena her to appear the next day, but the trial court answered that it did not believe that this was necessary. The prosecutor then told the trial court that he had four phone numbers he could use to contact Birden and that he would "track her down."
 {¶ 35} The next day, the State began its presentation of the evidence on rebuttal by calling Birden to the stand. The bailiff informed the trial court, in the jury's presence, that Birden was not present. At a sidebar, the prosecutor said he tried contacting Birden at the three phone numbers available to him, but that there was no answer at two of the numbers and no minutes available for the third number. The prosecutor then called his next witness.
 {¶ 36} During closing argument, the prosecutor used Birden's failure to appear for rebuttal to impeach her testimony.
 {¶ 37} "Daphne Birden, [defense counsel] didn't even mention her [during his closing argument]. You know why he didn't mention her? Because she didn't come back. She left and was told by the Judge to come back and she didn't even come back. Why? Because of the tape. I told her I was going to play it for her. Come back to listen to it. I guess she wasn't interested. Speaks volumes. *Page 9 
 {¶ 38} "What people don't say is as important as the things they do say. What people don't do is as important as the things that they do. * * *
 {¶ 39} "Daphne Birden doesn't seek the truth. She gets paid for the truth. Her truth, whatever the price is, she must not have gotten paid enough. She could only tell half of the story."
 {¶ 40} A prosecutor is encouraged to prosecute with earnestness and vigor. State v. Smith (1984), 14 Ohio St.3d 13, 14, citing Berger v.United States (1935), 295 U.S. 78, 88. Nevertheless, there are limitations on what a prosecutor may do at trial. For example, prosecutors may not allude to matters not supported by admissible evidence in their closing argument. Id. The prosecutor in this case did just that. There was never any evidence before the jury that Birden disobeyed the trial court's order by not returning to be called as a rebuttal witness. Likewise, there is no evidence that the prosecutor told Birden he was going to play the tape. The prosecutor used these facts, which were not based on admissible evidence, to directly attack Birden's credibility. This was clearly misconduct.
 {¶ 41} Nevertheless, Carter has not shown that he was prejudiced by this misconduct. There was a second reason to doubt Birden's testimony, Wrenn's testimony that Robinson bribed Birden. The prosecutor also mentioned this during closing argument. This ground alone is enough to seriously doubt Birden's credibility. Accordingly, we cannot conclude that the prosecutor's remarks in this case were enough, on their own, to require a reversal. Carter's arguments to the contrary are meritless.
 Closing Argument {¶ 42} Carter contends that much of the State's closing argument consisted of a deliberate attempt to appeal to the jury's emotions, repeated interjection of the prosecutor's personal opinion, repeated references to facts outside the record, and denigration of defense counsel. The State contends that Carter has waived all but plain error in regard to the prosecutor's comments during closing argument and that those comments do not constitute misconduct.
 {¶ 43} When reviewing the statements a prosecutor makes during closing *Page 10 
argument for prosecutorial misconduct, the Ohio Supreme Court has instructed appellate courts to give prosecutors "a certain degree of latitude in summation. The prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument. We view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial." (Citations omitted) State v. Treesh, 90 Ohio St.3d 460,466, 2001-Ohio-0004.
 {¶ 44} Despite the fact that prosecutors are encouraged to argue fervently for conviction, see State v. Stephens (1970),24 Ohio St.2d 76, 82, a prosecutor cannot express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused.State v. Smith (1984), 14 Ohio St.3d 13, 13-14. Furthermore, a prosecutor cannot go beyond the evidence which is before the jury when arguing for a conviction. Id.
 {¶ 45} Carter argues that the prosecutor's entire closing argument was designed to appeal to the juror's emotions, but a review of the entire argument does not support this contention. The prosecutor certainly began and finished his closing argument with references to the loss that Wade's family suffered. However, the bulk of the closing argument is based on the evidence introduced at trial and the prosecutor's inferences from that evidence. "[A] conviction based solely on the inflammation of fears and passions, rather than proof of guilt, requires reversal." State v. Williams (1986), 23 Ohio St.3d 16, 20. But "[r]ealism compels us to recognize that criminal trials cannot be squeezed dry of all feeling." State v. Keenan, 66 Ohio St.3d 402, 409. The prosecutor did not excessively appeal to the jury's emotions with his references at the beginning and end of his argument.
 {¶ 46} Carter next contends that the prosecutor improperly expressed his personal belief or opinion numerous times and made numerous references to facts outside the record. However, a prosecutor is permitted to make reasonable inferences from the evidence and many of these instances are nothing more than inferences from the evidence. SeeTreesh at 466. For instance, the prosecutor told the jury, "I know what happened in this case." However, he followed this up by explaining that he and the jury knew what happened because they had all heard the testimony. Clearly, the prosecutor's *Page 11 
statement was an inference based on the evidence.
 {¶ 47} Similarly, the prosecutor referred to Carter as someone who kills people. But this statement does not indicate that the prosecutor has knowledge of facts outside the record. Instead, it shows that he reached this conclusion based on the evidence in this case.
 {¶ 48} Finally, Carter complains about the references to him and Robinson being drug dealers. However, a witness testified that Carter and Robinson were angry because drugs were stolen in the robbery of Robinson's brother. And the State's whole case was based on the theory that Robinson and Carter sought revenge on Wade because of that robbery. The prosecutor's comments were merely inferences from evidence in the record.
 {¶ 49} Other examples of this type of prosecutorial misconduct which Carter cites, such as the feelings of people on the street, speculation about whether Robinson and Carter planned the shooting before it occurred, and speculation on exactly what occurred at the scene of the crime, are more obviously examples of inferences based on the evidence.
 {¶ 50} Finally, Carter maintains that the prosecutor improperly denigrated defense counsel in his closing argument. This argument is baseless. During trial, a witness testified that he saw a defense witness receive money from Robinson shortly after that defense witness spoke to defense counsel. The prosecutor's recitation of these facts at closing argument is proper and does not denigrate counsel since it does not infer that counsel knew or approved of the alleged bribes.
 {¶ 51} Carter's arguments concerning the prosecutor's comments during closing statements are all meritless.
 Effective Assistance of Counsel {¶ 52} In his third assignment of error, Carter argues:
 {¶ 53} "The Appellant was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution due to trial counsel's conflict of interest in representing the Appellant and his codefendant at trial; his *Page 12 
failure to seek severance of the defendants; his failure to object to other acts evidence, hearsay evidence, and the prosecutor's improper closing argument."
 {¶ 54} To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate counsel's performance was deficient and that deficient performance prejudiced the defense. Strickland v.Washington (1984), 466 U.S. 668, 687. A properly licensed attorney is presumed to execute his duties in an ethical and competent manner.State v. Smith (1985), 17 Ohio St.3d 98, 100. When reviewing whether counsel's performance was ineffective, courts must refrain from second-guessing strategic decisions of trial counsel. State v.Sallie, 81 Ohio St.3d 673, 674, 1998-Ohio-0343. Ineffectiveness is demonstrated by showing counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment.State v. Hamblin (1988), 37 Ohio St.3d 153, 156. To establish prejudice, a defendant must show there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. Strickland at 694. A reasonable probability must be a probability sufficient to undermine confidence in the outcome of the case. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. The defendant bears the burden of proof in demonstrating ineffective assistance of counsel. Smith at 100.
 {¶ 55} Carter argues that his counsel is ineffective for many reasons and we will address each of those arguments separately.
 Conflict of Interests {¶ 56} In this case, the same defense counsel represented both Carter and Robinson at their joint trial. Prior to trial, the State offered Carter a plea agreement, which was contingent upon Carter's agreement to testify against Robinson. At two hearings, the trial court inquired into whether Carter wanted to discuss the plea offer with separate, court-appointed counsel. Each time, Carter refused. Carter contends that the trial court's efforts were insufficient since it waited to make its inquiry until shortly before trial and failed to ensure that Carter's acceptance of joint representation was voluntary and knowing.
 {¶ 57} In cases of potential conflict of interest resulting from one attorney *Page 13 
representing co-defendants, the United States Supreme Court has held that dual representation is not a per se violation of due process and, in some cases, it may be preferable to launch a common defense against a common attack. Holloway v. Arkansas (1978), 435 U.S. 475, 482-483. However, the possibility of a conflict of interest exists in every instance of multiple representation. Cuyler v. Sullivan (1980),446 U.S. 335, 348.
 {¶ 58} Both defense counsel and the trial court have an affirmative duty to ensure that conflicts do not interfere with a defendant's representation. State v. Dillon, 74 Ohio St.3d 166, 167-68, 1995-Ohio-0169. If defense counsel recognizes a potential conflict in his representation of both clients, he should timely object to his dual representation and move the court to withdraw from representing at least one of the two defendants since he "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial."Holloway at 485. If an attorney makes such an objection, the trial court must either appoint separate counsel or "take adequate steps to ascertain whether the risk [of conflict] was too remote to warrant separate counsel." Id. at 484. Failure to make such an inquiry when faced with a timely objection deprives the defendant of his constitutional guarantee of effective assistance of counsel. Id. Consequently, when a court requires joint representation over objection without making sufficient inquiry, prejudice is presumed, and reversal is required. Id. at 488.
 {¶ 59} In some cases, neither counsel nor defendant raises an objection to the joint representation. In those cases, "[a] trial court is not constitutionally mandated to inquire of criminal co-defendants whether they wish to be jointly represented by the same counsel."State v. Manross (1988), 40 Ohio St.3d 180, syllabus. A trial court's duty to inquire only arises when it "knows or reasonably should know that a particular conflict exists." Id. at 181. Absent any indication to the contrary, a trial court may assume that either the joint representation presents no conflict or that the lawyer and clients have knowingly accepted the risk of any conflict that may exist.Cuyler at 347. In those situations where no objection is raised to the trial court regarding the joint representation, the defendant's conviction will only be reversed if he "shows that an actual conflict *Page 14 
adversely affected counsel's representation of said defendant."Manross at syllabus; Cuyler at 348.
 {¶ 60} In this case, the prosecution's plea offer created an actual conflict of interest between Carter and Robinson, since a condition of that offer was that Carter testify against Robinson. However, we cannot tell from the record whether counsel's joint representation adversely affected Carter. In particular, it is impossible to say, at this stage in the proceedings, whether separate counsel would have advised Carter to accept the plea offer and/or whether Carter would have taken this advice and actually accepted that offer. Carter is merely asking that this court speculate as to the effect of separate counsel on this decision. We cannot do so. This is an issue which is the proper subject of post-conviction proceedings.
 Failure to Seek Severance {¶ 61} Carter next argues that his counsel was ineffective for failing to request separate trials for Carter and Robinson. He claims that counsel's ineffectiveness in this regard allowed damning evidence against Robinson, namely evidence of Robinson's prior actions with a firearm and of Robinson's bribery attempts, to be used against him as well.
 {¶ 62} Joinder is governed by R.C. 2945.13, which provides as follows:
 {¶ 63} "When two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless the court, for good cause shown on application therefor by the prosecuting attorney or one or more of said defendants, orders one or more of said defendants to be tried separately."
 {¶ 64} The law favors joinder because a single trial will conserve time and expense and may minimize the potentially disparate outcomes that can result from successive trials before different juries.State v. Schiebel (1990), 55 Ohio St.3d 71, 86-87; State v. Torres
(1981), 66 Ohio St.2d 340, 343; State v. Thomas (1980),61 Ohio St.2d 223, 225. However, the interest in joint trials is not unrestricted. Crim.R. 14 allows a trial court to sever the defendants or provide other relief in the interest of justice if a defendant can demonstrate that he is prejudiced by joinder with other defendants charged in the indictment. Severance may be warranted if the trial court finds a serious risk that a joint *Page 15 
trial would compromise a specific right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence. United States v. Zafiro (1993), 506 U.S. 534, 539.
 {¶ 65} In this case, Carter argues that joinder of the trials allowed evidence which was inadmissible against him, namely, Robinson's prior brandishment of a firearm and bribery attempts, to be used against him. The most damning of these two types of evidence is the evidence that Robinson had attempted to bribe witnesses. However, trial counsel could not have been ineffective for failing to request severance because of the bribery evidence since that evidence was rebuttal evidence which was not made known to counsel prior to trial. Counsel could not reasonably be expected to anticipate that the State may bring evidence that one co-defendant attempted to bribe witnesses when he is not given any advance warning of such evidence prior to trial.
 {¶ 66} Furthermore, counsel was not ineffective for failing to request a severance due to the evidence that Robinson had brandished a firearm in the month prior to Wade's death. This evidence was, for the most part, cumulative of other evidence already introduced. Many witnesses testified that tensions had been rising between Robinson and Carter on one side and Sayles and his friends on the other. Many witnesses testified that they had seen Robinson with a firearm. Thus, the fact that Robinson had brandished a firearm at Sayles and Sayles's friend added little.
 {¶ 67} In conclusion, counsel was not ineffective for failing to request that the trial be severed. Carter's arguments to the contrary are meritless.
 Failure to Object to Hearsay Evidence {¶ 68} Carter next argues that defense counsel was ineffective for failing to object to the admission of statements made by Robinson as substantive evidence against him. This argument is similar to the one addressed in Carter's fourth assignment of error. For the reasons given in that assignment of error, Carter's arguments in this regard are meritless. *Page 16 
 Failure to Object to Prosecutorial Misconduct {¶ 69} Carter's final argument within this assignment of error is that his counsel was ineffective for failing to object to the instances of prosecutorial misconduct he raises in his second assignment of error. For the reasons given above, this alleged misconduct was either not misconduct or did not affect Carter's substantial rights. Accordingly, Carter's arguments in this regard are also meritless.
 Right to Confront Adverse Witnesses {¶ 70} In his fourth assignment of error, Carter argues:
 {¶ 71} "The Appellant was denied his right to confront the witnesses against him under the Sixth Amendment of the United States Constitution and Article I Section 10 of the Ohio Constitution."
 {¶ 72} In this assignment of error, Carter contends that he was deprived of his right to cross-examine the witnesses against him in three ways: 1) by limiting the defense's ability to cross-examine the State's only eye witness, Carl Williams, about his criminal history; 2) by allowing the prosecution to introduce testimony which was not based on the witness's personal knowledge; and, 3) by admitting statements by Robinson, Carter's non-testifying co-defendant, as substantive evidence of Carter's guilt. Each of these issues will be addressed in turn.
 Cross-Examination of Williams {¶ 73} Carter's defense at trial was to attack the credibility of the State's only eye witness, Williams. He claims the trial court wrongfully prevented him from presenting this defense in full by limiting Carter's ability to inquire into Williams' criminal history. Carter complains of three specific instances when the trial court sustained an objection, which limited his ability to cross-examine Williams on certain subjects. In the first instance, defense counsel was asking Williams about various identities he had used in the past. Williams explained that he had more than one identity because he was "involved in a fraud conspiracy." Counsel then asked Williams, "Tell me about that," to which the prosecutor objected. The trial court sustained the objection and explained at a sidebar that defense counsel could inquire into Williams' convictions, but not the background of *Page 17 
those convictions. Defense counsel then began questioning Williams on a different subject.
 {¶ 74} In the second instance, defense counsel was cross-examining Williams about the specifics of what he allegedly saw at the scene and comparing these statements to Williams' prior statements to police. After Williams responded that he may have to have his memory refreshed, counsel asked, "How about 900 grams of marijuana and 220 grams of cocaine?" The prosecutor objected, the trial court sustained the objection, and the parties then had a sidebar. At the sidebar, the prosecutor stated that Williams had not been convicted for anything regarding those drugs and the trial court stated that he wanted "no further discussion" of those issues and, "We're done with that kind of stuff." Defense counsel then began questioning Williams on other topics.
 {¶ 75} In the final instance which Carter cites, defense counsel was asking Williams about how long Williams had been cooperating with federal authorities during recross-examination. The prosecutor objected to these questions and the trial court excused the jury for lunch without ruling on the objection. At a sidebar, the trial court indicated that the parties held an unrecorded conference at which they discussed the objection and instructed counsel that he should not inquire further into that topic. When the trial resumed after lunch, defense counsel did not resume this line of questioning.
 {¶ 76} Evid.R. 609(A) allows a party to use a witness's prior convictions to impeach the witness's testimony. However, this Rule only applies to convictions; prior bad acts which have not resulted in convictions cannot be used as the basis for an attack upon a witness's credibility. State v. Rodriquez (1986), 31 Ohio App.3d 174, 176.
 {¶ 77} When the conviction is only being used to attack a witness's credibility, a trial court has broad discretion to limit any questioning of the witness on cross-examination which asks more than the name of the crime, the time and place of conviction and the punishment imposed.State v. Robb, 88 Ohio St.3d 59, 71, 2000-Ohio-0275. Accordingly, this court must affirm the trial court's decision absent an abuse of that discretion. State v. Wright (1990), 48 Ohio St.3d 5, 8. The term "abuse of discretion" connotes more than an error of law or judgment; it implies an attitude that is *Page 18 
arbitrary, unreasonable, or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 78} In this case, the sole purpose for using Williams' prior convictions was to attack his credibility. Accordingly, we must review the trial court's decision for an abuse of discretion.
 {¶ 79} In this case, the trial court did not abuse its discretion when it refused to let defense counsel delve into the fraud conspiracy which Williams mentioned on cross-examination. Even if Williams' fraudulent acts had resulted in a conviction (and there is no evidence supporting this conclusion in the record), the information defense counsel was seeking was far beyond the name of the crime, the time and place of conviction and the punishment imposed. Furthermore, there is no indication in the record that the facts of that possible prior conviction bear any relevance to Williams' credibility in this case.
 {¶ 80} The trial court also did not abuse its discretion when it prevented defense counsel from questioning Williams about drugs. There is no indication that Williams was ever convicted for any offense involving the drugs to which counsel referred. In his brief, Carter hints that criminal charges may have been filed against Williams regarding those drugs in Jefferson County and those pending charges may have given Williams a motive to lie on the stand. However, such evidence is not before this court in this appeal and, if true, would be the proper subject of a post-conviction proceeding.
 {¶ 81} Finally, the trial court did not abuse its discretion when it stopped Carter's cross-examination into the length of time that Williams had been cooperating with federal authorities. After an unrecorded sidebar, the trial court concluded that the line of questioning should be discontinued. We must presume that the trial court's decision in this regard is correct, since the unrecorded sidebar could easily have revealed that counsel was just going to further delve into the facts underlying Williams' criminal history. State v. Phillips,74 Ohio St.3d 72, 92, 1995-Ohio-0171.
 {¶ 82} In conclusion, the trial court did not abuse its discretion when it limited the scope of Carter's cross-examination of Williams in the manners discussed above. Carter's arguments to the contrary are meritless. *Page 19 
 Testimony Not Based on Personal Knowledge {¶ 83} In his second argument in support of this assignment of error, Carter contends that his right to confrontation was violated in three ways: 1) by the admission of testimony about the deterioration in the relationship between Wade and Carter/Robinson since such testimony was not based on personal knowledge; 2) by the admission of James Wrenn's testimony on rebuttal about what Daphne Birden told him after allegedly receiving the bribe from Robinson; and, 3) the warrant authorizing the search of Robinson's apartment.
 {¶ 84} The Confrontation Clause, which is encapsulated within theSixth Amendment of the Constitution, is the right of an accused "to be confronted with the witnesses against him." Sixth Amendment, United States Constitution. This Clause ensures that all criminal defendants have the right to confront the witnesses against them. Maryland v.Craig (1990), 497 U.S. 836, 843. The purpose behind the Confrontation Clause is two-fold: 1) to allow a criminal defendant the right to confront his or her accusing witness face-to-face in open court for truth-testing cross-exam inations and 2) to give the jury an opportunity to judge the credibility of the witness through observation of the witness's demeanor. Mattox v. United States (1895), 156 U.S. 237,242-43.
 {¶ 85} Carter's argument that he was denied his right to confront the witnesses against him because the portions of some of the witnesses' testimony, specifically evidence of the deteriorating relationship between Wade and Carter/Robinson, was not based on their own personal knowledge is meritless. Carter still had the opportunity to cross-examine these witnesses and their credibility about those subjects could easily be called into question if Carter could have proved that their testimony was not based on their own personal knowledge. Furthermore, many of these witnesses based their opinions on the relationship between Wade and Carter/Robinson on their personal knowledge; they did not repeat hearsay when they made these statements, but made independent observations based on what they heard. Any error in the admission of any of this testimony has nothing whatsoever to do with Carter's rights under the Confrontation Clause. Furthermore, any error in the admission of any single one of these *Page 20 
statements did not prejudice Carter, since such testimony would merely be cumulative of the other, properly admitted testimony.
 {¶ 86} Carter's arguments concerning the admission of hearsay evidence merits more discussion. The Confrontation Clause and hearsay rules spring from a common origin and protect the same values; nevertheless, the proscriptions of the Confrontation Clause cannot be likened with the general rule prohibiting the admission of hearsay statements. White v.Illinois (1992), 502 U.S. 346, 352. The hearsay rule generally prevents the admission of out-of-court statements made by a non-witness, since such statements are of questionable reliability. See State v.McGuire, 80 Ohio St.3d 390, 400, 1997-Ohio-0335, citing Chambers v.Mississippi (1973), 410 U.S. 284 (The hearsay rule should not be strictly applied in order to exclude highly reliable evidence, since such an exclusion may deny due process to a criminal defendant).
 {¶ 87} In contrast, the Confrontation Clause ensures that a defendant will not be convicted based upon charges of unseen, unknown, and unchallengeable witnesses. Lee v. Illinois (1986), 476 U.S. 530, 540. Accordingly, the Confrontation Clause prohibits the admission of some evidence that would otherwise be admissible under a hearsay exception.Idaho v. Wright (1990), 497 U.S. 805, 814.
 {¶ 88} The admission of hearsay does not violate the Confrontation Clause if 1) the prosecutor shows that the declarant is unavailable to testify and 2) the statement bears adequate "indicia of reliability."Ohio v. Roberts (1980), 448 U.S. 56, 66. The indicia of reliability prong can be satisfied with a showing that the evidence falls within a "firmly rooted" hearsay exception or the evidence has particularized guarantees of trustworthiness. Id. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial."Wright at 822. The guarantees of trustworthiness must be shown from the totality of the circumstances. Id. at 819.
 {¶ 89} In this case, Wrenn testified that he took Daphne Birden to see defense counsel soon before trial. After leaving counsel's office, Wrenn took her to see Robinson. *Page 21 
Daphne Birden went into a room with Robinson and came out with $470.00. She then told Wrenn, "Damn, we got paid good for doing this."
 {¶ 90} Daphne Birden's statement is clearly hearsay. "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Daphne Birden's statement was an out-of-court statement made by someone other than the witness (Wrenn), which was offered to prove the truth of the matter asserted (That Daphne Birden was bribed). Accordingly, it was improper to admit this evidence unless one of the exceptions to the hearsay rule applies.
 {¶ 91} The State contends that the statement could be admissible as either a present sense impression, under Evid.R. 803(1), or an excited utterance, under Evid.R. 803(2). We agree, especially since Carter objected to Wrenn's testimony generally, but did not specifically object to this statement.
 {¶ 92} Evid.R. 803(2) allows a statement which would otherwise be inadmissible hearsay to be admitted if it is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The admissibility of such statements does not depend upon the availability of the declarant as a witness. Evid.R. 803. Such statements are admissible because "[t]he circumstances surrounding an excited utterance — a startling event, a statement relating to that event, a declarant under the stress of the event — do not allow the declarant a meaningful opportunity to reflect on statements regarding the event. Without opportunity to reflect, the chance that a statement is fabricated, or distorted due to a poor memory, is greatly reduced." State v.Wallace (1988), 37 Ohio St.3d 87, 88.
 {¶ 93} In this case, Daphne Birden's statement was made immediately after she received the alleged bribe, an event which the trial court could reasonably have concluded would be a startling event. The statement was related to that event and, given the immediacy between event and statement, the trial court could have reasonably concluded that Daphne Birden was under the excitement of the event when making the statement. These conclusions are stronger since Carter did not challenge this particular *Page 22 
testimony as hearsay or test its admissibility under this hearsay exception.
 {¶ 94} The excited utterance hearsay exception is a firmly rooted hearsay exception with sufficient guarantees of trustworthiness.State v. Shoop (1993), 87 Ohio App.3d 462, 473. Accordingly, the admission of this testimony did not violate Carter's rights under the Confrontation Clause.
 {¶ 95} Carter's final argument under the Confrontation Clause is that the trial court erred by admitting the warrant authorizing the search of Robinson's apartment into evidence. He complains that the affidavit attached to the warrant contained hearsay which was different than the testimony presented at trial. He also argues that the warrant revealed that Robinson had previously been convicted of carrying a concealed weapon involving a firearm and discusses the possible sale of drugs from Robinson's residence. However, the admission of this evidence did not affect Carter's rights under the Confrontation Clause.
 {¶ 96} The admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial since the defendant has the opportunity to confront the declarant on cross-examination. State v.Keenan (1998), 81 Ohio St.3d 133, 142, 689 1998-Ohio-0459, citingCalifornia v. Green (1970), 399 U.S. 149. In this case, the person who signed the affidavit, Detective John Stasiulewicz, testified at trial. Likewise, the hearsay within the affidavit which Carter objects to are statements by Tomeka Smith, another person who testified at trial. Each of these people were subject to cross-examination at trial. Thus, the admission of this exhibit did not violate Carter's rights under the Confrontation Clause.
 Co-Defendant's Out-of-Court Statements {¶ 97} In his final argument within this assignment of error, Carter contends that he was denied his rights under the confrontation clause when the trial court admitted out-of-court statements allegedly made by Carter's co-defendant, Robinson. He contends that such statements are "presumptively unreliable" and that the outcome of the trial likely would have been different if these statements had not been admitted. In response, the State contends that Carter cannot raise this error since he made a knowing, intelligent, *Page 23 
and voluntary decision to be jointly tried with Robinson.
 {¶ 98} The State's argument is meritless. Carter did both express to the trial court that he did not wish for independent counsel and filed an affidavit expressing his desire to be tried jointly with Robinson. But at no time did the trial court ask Carter the questions necessary to ascertain whether Carter knew and understood the issues surrounding the admission of Robinson's out-of-court statements against him. Carter's actions prior to trial do not constitute a knowing, intelligent, and voluntary waiver of these issues.
 {¶ 99} Nevertheless, Carter did not object to the admission of these statements during trial. Accordingly, he has waived all but plain error. Crim.R.52(B); State v. Jalowiec, 91 Ohio St.3d 220, 226, 2001-Ohio-0026. An error is not a plain error "unless, but for the error, the outcome of the trial clearly would have been otherwise. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."State v. Long (1978), 53 Ohio St.2d 91, 97.
 {¶ 100} Carter tries to argue that hearsay statements are subject to a higher level of scrutiny, by saying that they are "presumptively unreliable." However, Carter uses that phrase out of context. The United States Supreme Court has held the admission of certain types of hearsay evidence is "presumptively unreliable" and that the admission of such evidence may violate the Confrontation Clause. Lilly v. Virginia (1999),527 U.S. 116. However, this presumption is overcome if the statement bears adequate indicia of reliability, such as being a "firmly rooted" hearsay exception. Roberts at 66. Hearsay-related issues are not subject to higher scrutiny than other evidentiary issues, and Carter's insinuations that they are subject to heightened scrutiny are meritless.
 {¶ 101} Robinson's out-of-court statements fall into two general categories: 1) statements before Wade's death showing that Robinson wanted revenge after the robbery and assault of his brother and 2) Robinson's statements to Williams after the murder. The issues surrounding the admission of each category of testimony are very different, although the issues within each category are similar.
 {¶ 102} The trial court did not commit plain error when admitting the first category *Page 24 
of testimony. Some of these statements do not show that Robinson had an escalating desire to exact revenge on Wade for the crimes against Robinson's brother. For instance, both Wade's father and brother talked to Robinson to dissuade him from taking action against Wade. They each said that Robinson said, "okay," or "all right," statements which are far from damning.
 {¶ 103} Other statements appear to be excited utterances or present sense impressions and, therefore, admissible under Evid.R. 803(1) and (2). For instance, Dixon said that Robinson was "very upset" about the assault on his brother and testified about altercations between Robinson and other parties. This testimony clearly falls within these exceptions. Likewise, the statements Robinson made to Brown on the night of the murder could have been understood to be excited utterances, especially since there was no objection to this testimony.
 {¶ 104} The same cannot be said of Robinson's statements to Williams. Those statements were both bribes and confessional in nature. The only hearsay exception they could fit into would be Evid.R. 804(3), statements against interest.
 {¶ 105} The United States Supreme Court has held that it is error to admit any statements made by a non-testifying co-defendant that inculpates an accused since this violates the accused's Sixth Amendment right to confront one's accusers. Bruton v. United States (1968),391 U.S. 123, 137. However, this rule does not come into play in this case since Robinson's statements do not implicate Carter.
 {¶ 106} Since this case does not involve Bruton-type issues, Carter's rights under the Confrontation Clause are violated unless Robinson's statements fall within a firmly rooted hearsay exception or contain adequate indicia of reliability. Roberts at 66; State v. Robinson, 7th Dist. No. 00 CA 190, 2002-Ohio-6734, at ¶ 19. Evid.R. 804(3) is a firmly rooted exception to the rule against the admission of hearsay. State v.Gilliam, 70 Ohio St.3d 17, 20, 1994-Ohio-0348. Accordingly, the admission of this evidence did not violate Carter's rights under the Confrontation Clause.
 Other Evidentiary Issues {¶ 107} In his fifth assignment of error, Carter argues: *Page 25 
 {¶ 108} "The trial court denied Appellant his rights to a fair trial and due process of law by permitting witness testimony that did not conform to Evid.R. 401, 403, and 404(B)."
 {¶ 109} In this assignment of error, Carter contends that the trial court erred when allowing evidence of Carter's prior possession of a handgun and evidence of Robinson's attempts to bribe witnesses. He contends that this evidence is inadmissible character evidence which was not introduced for any of the permissible purposes under Evid.R. 404(B), which bars the use of "other acts" evidence to prove the character of a person in order to show that he acted in conformity therewith.
 {¶ 110} Carter contends that the State consistently elicited testimony regarding Carter's prior possession of a handgun. He maintains this is inadmissible "other acts" evidence and should have been excluded. In response, the State argues that Carter opened the door to the admission of this type of evidence when Carter's brother testified that Carter had not possessed a gun in the past.
 {¶ 111} Character evidence is generally not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion. Evid.R. 404(A). Thus, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). This rule of evidence is in accord with R.C.2945.59, which allows this kind of evidence to come in for particular purposes in a criminal case.
 {¶ 112} "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant." Id.
 {¶ 113} "The focus of the inquiry into the admissibility of other-acts evidence is *Page 26 
whether the evidence is being offered for the impermissible purpose of proving that the accused acted in conformity with his or her criminal character in committing the charged offenses, or whether the evidence is being offered for another purpose." State v. Pearson (1996),114 Ohio App.3d 168, 185. Because Evid.R. 404(B) and R.C. 2945.59 contain exceptions to the common-law rule that such other-acts evidence is inadmissible, both provisions must be construed strictly against the admissibility of such evidence. State v. Broom (1988),40 Ohio St.3d 277, paragraph one of the syllabus.
 {¶ 114} Evidence that a person carries a gun is the type of "other acts" evidence which is generally inadmissible since it portrays the person as a violent individual who regularly carried guns. State v.Carusone, 1st Dist. No. C-010681, 2003-Ohio-1018, at ¶ 30. However, this type of evidence is admissible if it is admitted for another purpose.State v. Parrish (1991), 71 Ohio App.3d 659, 666.
 {¶ 115} Evidence that a defendant in a crime involving a firearm possessed a firearm at a point near in time to the crime is relevant to show that the person had an opportunity to use a firearm in the crime.Parrish at 666. Such evidence can also be used to prove motive, intent, preparation, and plan. State v. Bruno, 8th Dist. No. 77202, 2001-Ohio-4227.
 {¶ 116} In this case, Carter never opened the door to evidence of his propensity for possessing firearms. All of the testimony in this case regarding Carter's prior possession or non-possession of firearms, including that from Carter's brother, was elicited by the State. Nevertheless, this evidence was admissible.
 {¶ 117} No firearm matching the one used to murder Wade was ever recovered. However, the police recovered many bullets both at the scene and within Wade. Numerous witnesses testified that they had seen Carter with a firearm and that firearm matched the caliber of weapon which was used to kill Wade. Thus, this testimony established that Carter had an opportunity to murder Wade with such a weapon. This testimony could also establish intent, preparation, or plan, since Carter could arguably have been carrying the firearm in preparation for retaliation for the assault on Robinson's brother. Carter's argument that this testimony should not have been admitted is *Page 27 
meritless.
 {¶ 118} Carter next argues that the trial court erred by allowing evidence of Robinson's bribery attempts since such testimony was improper "other acts" evidence. However, this evidence was clearly not introduced to show that Robinson has a propensity to bribe. Instead, the bribe to Daphne Birden was offered to show that she had a motive to perjure herself when testifying on the defendants' behalf. Likewise, the attempted bribe to Williams was not introduced to demonstrate Robinson's character.
 {¶ 119} Carter clearly has valid complaints regarding the admission of Robinson's bribery attempts. However, his complaints have nothing whatsoever to do with the admissibility of that evidence under Evid.R. 404(B). Accordingly, Carter's arguments in this regard are meritless.
 Weight and Sufficiency of the Evidence {¶ 120} In his sixth assignment of error, Carter argues:
 {¶ 121} "The Appellant's convictions for aggravated murder and complicity to aggravated murder are against the manifest weight of the evidence and without sufficient evidence as a matter of law."
 {¶ 122} The Ohio Supreme Court has stated that arguments concerning the "sufficiency of the evidence' should not be confused with those addressing the `manifest weight of the evidence.'" See State v.Thompkins, 78 Ohio St.3d 380, 1997-Ohio-0052, at paragraph two of the syllabus ("The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.") "Sufficiency of the evidence" is "`a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" Id. at 386, quoting Black's Law Dictionary (6 Ed.1990) 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate *Page 28 
court finds that reasonable minds could not reach the conclusion reached by the trier of facts." Id. at 273. Whether the evidence is legally sufficient is a question of law. Thompkins at 386.
 {¶ 123} In contrast, when reviewing whether a conviction was against the manifest weight of the evidence, this court must "examine whether the evidence produced at trial `attains the high degree of probative force and certainty required of a criminal conviction.'" State v.Tibbetts, 92 Ohio St.3d 146, 163, 2001-Ohio-0132, quoting State v.Getsy, 84 Ohio St.3d 180, 193, 1998-Ohio-0533. In order to do this, this court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. "`Weight is not a question of mathematics, but depends on its effect in inducing belief" (Emphasis sic.)Thompkins at 387, quoting Black's Law Dictionary (6 Ed.1990) 1594.
 {¶ 124} Carter was convicted of aggravated murder in violation of R.C.2903.01(A). That statute defines the offense as "purposely, and with prior calculation and design, caus[ing] the death of another or the unlawful termination of another's pregnancy." Id. On appeal, Carter only argues that there is not sufficient evidence showing prior calculation and design.
 {¶ 125} In order to show that a person has acted with prior calculation and design, the State must prove more than "instantaneous deliberation;" instead, the State must show that the defendant had a scheme designed to implement a calculated decision to kill. State v.Cotton (1978), 56 Ohio St.2d 8, paragraphs two and three of the syllabus. Courts have been unable "to formulate a bright-line test that emphatically distinguishes between the presence or absence of `prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." State v. Taylor,78 Ohio St.3d 15, 20, 1997-Ohio-0243.
 {¶ 126} In this case, the evidence supports the jury's conclusion that the murder was with prior calculation and design. The testimony shows that tensions rose between *Page 29 
Robinson and Carter and Wade during the month of August 2001. During the night that Wade was shot, both he, Robinson, and Carter were at the Safari Lounge in Steubenville, Ohio. At one point during the night, Troy Dixon, a friend to Wade, Robinson, and Carter, heard Carter say that "he should kill everybody" in Wade's group of friends. Dixon later warned Sayles and Wade because he had a feeling something bad would happen, based on how Robinson and Carter were acting. Sayles confirmed that Dixon warned he and Wade. Robinson and Carter left the Safari Lounge before Wade.
 {¶ 127} Williams testified that he saw Carter and Robinson outside Wade's house that night after Robinson and Carter left the Safari Lounge. Wade then drove up in his van, got into a fight with Robinson, and Carter and Robinson shot Wade.
 {¶ 128} These facts are sufficient to show prior calculation and design. Carter and Robinson had been angry with Wade because of the assault on Robinson's brother and Carter has expressed his desire to kill Wade on the evening of Wade's death. Carter and Robinson then left the Safari Lounge to wait for Wade outside his home. They then shot and killed Wade. By waiting outside Wade's home, Carter demonstrated that he had a scheme designed to implement a calculated decision to kill. Accordingly, Carter's argument regarding the weight and sufficiency of the evidence supporting his conviction are meritless.
 Cumulative Error {¶ 129} In his final assignment of error, Carter argues:
 {¶ 130} "The cumulative effect of errors deprived the Appellant of his right to a fair trial under both the Ohio and United States Constitutions."
 {¶ 131} Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives appellant of a fair trial, despite the fact that each error individually does not constitute cause for reversal. State v. DeMarco (1987), 31 Ohio St.3d 191, paragraph two of the syllabus. However, the doctrine of cumulative error is not applicable where appellant fails to establish multiple instances of harmless error during the course of the trial. State v. Garner (1995),74 Ohio St.3d 49, 64, 1995-Ohio-0168. A defendant claiming cumulative *Page 30 
error must make "a persuasive showing of cumulative error." State v.Sanders, 92 Ohio St.3d 245, 279, 2001-Ohio-0189.
 {¶ 132} In this case, Carter has not demonstrated multiple instances of harmless error. Thus, this doctrine has no application to his appeal and Carter's seventh assignment of error is meritless.
 {¶ 133} Accordingly, all of Carter's assignments of error are meritless and the judgment of the trial court is affirmed.
 Donofrio, J., concurs. Waite, J., concurs. *Page 1