OPINION
{¶ 1} Defendant-appellant, Jason Carter (Carter), appeals his conviction in the Mahoning County Court of Common Pleas for murder following a jury trial. Carter alleges the following on appeal: speedy trial right violation; plain error when the trial court permitted evidence of Carter's post-Miranda silence; prosecutorial misconduct; ineffective assistance of counsel; and his conviction was against the manifest weight of the evidence.
 {¶ 2} On January 1, 2006, the slain body of Jamie White (White) was discovered along Salt Springs Road in Youngstown, Ohio.
 {¶ 3} On December 31, 2005, both Carter and White attended a New Year's Eve party on Midlothian Boulevard in Youngstown at the home of Michele Mattison (Michele), Carter's stepmother. At some point prior to midnight both Carter and White left the party. White was never again seen alive.
 {¶ 4} The police soon focused their investigation on Carter, White's boyfriend, and arrested him in connection with White's death on March 10, 2006.
 {¶ 5} On March 16, 2006, the Mahoning County Grand Jury indicted Carter on one count of murder, a violation of R.C. 2903.02(A)(D), a felony punishable by fifteen years to life incarceration.
 {¶ 6} On March 21, 2006, Carter appeared in court for his arraignment, pleaded not guilty, and was appointed trial counsel.
 {¶ 7} Trial commenced on November 13, 2006, and on November 17, 2006, the jury found Carter guilty of murder. The trial court sentenced Carter to fifteen years to life imprisonment.
 {¶ 8} Carter raises five assignments of error, the first of which states:
 {¶ 9} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND VIOLATED HIS STATUTORY AND CONSTITUTIONAL RIGHTS TO A SPEEDY TRIAL BY DENYING HIS MOTION TO DISMISS DUE TO EXPIRATION OF SPEEDY TRIAL FOR APPELLEE'S FAILURE TO BRING APPELLANT TO TRIAL WITHIN THE PERIOD SPECIFIED IN R.C. 2945.71." *Page 2 
 {¶ 10} In an attempt to avoid unnecessary repetition, the facts of this case are simultaneously analyzed under the law because many of the facts concern dates of filings, and the date of each filing presents issues for analysis under the law regarding tolling potential.
 {¶ 11} Carter does not set forth specific arguments as to how the trial court erred by denying his motion to dismiss. Instead, Carter reiterates the procedural history of the case, and makes some calculations relating to speedy trial time. It is unclear from Carter's argument as to how he arrived at the conclusion that the trial court violated his speedy trial time because he only offers calculations totaling 48 days, and he acknowledges that his limited waiver and motions to continue (discussed below) tolled the clock. Further, Carter never asserts whether his speedy trial time should have been calculated under the triple-count provision of R.C. 2945.71(E), or whether the State should have brought him to trial within 270 days pursuant to R.C. 2945.71(C)(2).
 {¶ 12} The State argues that Carter's trial was timely. The State correctly asserts that regardless of tolling events, the amount of time that elapsed between March 10, 2006, Carter's date of arrest, and November 13, 2006, the date of voir dire, totaled 248 days. Thus, even though many events tolled the clock, the State was still well within 270 days. The State also acknowledges that Carter failed to assert whether he benefited from the triple-count clock, but argues that "[e]ven on a triple-count clock, Carter's claim fails." The State asserts that there are only two periods of time not covered by tolling events, those being March 10, 2006 through March 28, 2006, and September 26, 2006 through November 13, 2006.
 {¶ 13} Ohio recognizes both a constitutional and a statutory right to a speedy trial. State v. King (1994),70 Ohio St.3d 158, 161, 637 N.E.2d 903. Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution state that a criminal defendant has the right to a speedy trial. Klopfer v. North Carolina (1967),386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d 1; State v.Selvage (1997), 80 Ohio St.3d 465, 466, 687 N.E.2d 433. *Page 3 
 {¶ 14} The statutory right to a speedy trial is embodied in R.C. 2945.71 to 2945.73. Because speedy trial is a constitutional right and a mandatory statutory requirement, the speedy trial provisions are strictly construed against the state. State v.Singer (1977),50 Ohio St.2d 103, 109, 4 O.O.3d 237, 362 N.E.2d 1216. Pursuant to statute, a person charged with a felony must be brought to trial within 270 days after the person's arrest. R.C. 2945.71(C)(2). However, each day a person is held in jail in lieu of bail is counted as 3 days, thus making the speedy trial time 90 days for a person who is charged with a felony and who cannot make bail. R.C. 2945.71(E).
 {¶ 15} If the State fails to meet these time limits, then the case must be dismissed. R.C. 2945.73. After the statutory time limit has expired, the defendant has established a prima facie case for dismissal. State v. Butcher (1986),27 Ohio St.3d 28, 30-31, 27 OBR 445, 500 N.E.2d 1368. The State then has the burden to demonstrate any extension of the time limit. Id.
 {¶ 16} Statutory speedy trial issues present mixed questions of law and fact. State v. Hiatt (1997),120 Ohio App.3d 247, 261, 697 N.E.2d 1025. Therefore, courts must "accept the facts as found by the trial court on some competent, credible evidence, but freely review the application of the law to the facts." Id. Courts must then independently review whether an accused was deprived of his statutory right to a speedy trial, strictly construing the law against the State. Brecksville v.Cook (1996), 75 Ohio St.3d 53, 57, 661 N.E.2d 706; State v.High (2001), 143 Ohio App.3d 232, 242, 757 N.E.2d 1176.
 {¶ 17} This court reviews a trial court's decision about whether a delay violated a defendant's constitutional speedy trial rights for an abuse of discretion. State v. Kuriger, 7th Dist. No. 07 JE 48, 2008-Ohio-1673, at ¶ 13, citingSelvage, supra, at 470. The phrase "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144. Furthermore, when applying the abuse-of-discretion standard, an *Page 4 
appellate court may not generally substitute its judgment for that of the trial court. State v. Herring (2002),94 Ohio St.3d 246, 255, 762 N.E.2d 940.
 {¶ 18} The police arrested Carter on March 10, 2006. (Carter's Brief, pp. 2, 8.) The day of arrest is not counted toward speedy trial time. State v. Catlin, 7th Dist. No. 06 BE 21, 2006-Ohio-6246, at ¶ 12-14, citing Crim. R. 45(A) and R.C. 1.14. Thus, the speedy trial time started running on March 11, 2006. From March 11, 2006 to April 9, 2006, Carter remained incarcerated solely on the murder charge. Thus, the triple-count provision applies to this time period. However, as discussed below, several intervening events toll the clock during this period.
 {¶ 19} Although Carter was arrested on March 10, 2006, he was not appointed counsel until March 21, 2006, which was his date of arraignment. Also during this period, Carter was indicted on March 16, 2006. R.C. 2945.72(C) states that "[a]ny period of delay necessitated by the accused's lack of counsel" extends the time within which the accused must be brought to trial, "provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law." However, in this case only 11 days passed, thus it appears that the trial court was diligent in providing counsel to Carter. Therefore, no time is tolled because there is nothing in the record to indicate that any actual delay was necessitated by Carter's lack of counsel, and Carter's speedy trial time should not be extended during the period of time preceding the initial appointment of counsel. See State v. Molina, 7th Dist. No. 07 MA 96, 2008-Ohio-1060, at ¶ 16-17.
 {¶ 20} The clock ran until Carter filed a request and demand for discovery on March 28, 2006. This motion contained confirmation that trial counsel received an information packet from the Mahoning County prosecutor's office on this same date. This court has held that even where the State responds on the same day a discovery demand is filed, such a discovery request would toll the speedy trial clock for one day. State v. Catlin, 7th Dist. No. 06 BE 20, 2006-Ohio-6247, at ¶ 20. This court reasoned that the State's case preparation was delayed by that one day, which obviously represented a reasonable time to prepare. Id. citingState v. Sanchez, *Page 5 162 Ohio App.3d 113, 2005-Ohio-2093, 832 N.E.2d 1215, at ¶ 13-16. InState v. Brown,98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159, syllabus, the Ohio Supreme Court held that a defendant's demand for discovery or a bill of particulars is a tolling event per R.C. 2945.72(E). The Ohio Supreme Court reasoned that "discovery requests by a defendant divert the attention of prosecutors from preparing their case for trial, thus necessitating delay." Id. at ¶ 23. On March 28, 2006, Carter also filed a motion to permit him to appear in civilian clothing, an additional request for discovery, and a motion for notice of intention to use evidence. On April 19, 2006, the trial court granted these motions. As discussed, defense motions toll the time, for a reasonable time, even if the motions themselves do not cause a rescheduled trial date. See State v. Williams, 7th Dist. No., 07 MA 162, 2008-Ohio-1532, at ¶ 23. Because Carter does not argue that taking 22 days to rule on these motions was unreasonable, the clock was stopped during this time. See id.; R.C. 2945.72(E);State v. Driver, 7th Dist. No. 03 MA 210, 2006-Ohio-494, at ¶ 18. Additionally, the speedy trial clock continued to be tolled until the State's response to Carter's other discovery request. See State v. Findley, 7th Dist. No. 07 MA 53, 2008-Ohio-1549, at ¶ 8. On May 15, 2006, the State filed a supplemental discovery disclosure including Bureau of Criminal Investigation (BCI) reports. From March 11, 2006 through March 28, 2006, the clock ran for a total of 51 days (17 days multiplied by 3 days per triple count rule = 51 days). Due to discovery requests, the clock was tolled for a total of 49 days from March 28, 2006 until May 15, 2006.
 {¶ 21} During the aforementioned tolling period, the trial court revoked Carter's bond on a charge of failure to pay child support (2004 CR 1369) on April 10, 2006. Thus, from this point, the triple-count provision no longer applied. The triple-count provision only applies to an offender held in jail "solely on the pending criminal charges." State v. Dubose, 7th Dist. No. 00 CA 60, 2002-Ohio-6613, at ¶ 8, citing State v.Cook (1992) 65 Ohio St.3d 516, 518, 605 N.E.2d 70. Accordingly, this court has held that, "where the offender would not be let free if the pending charge was dismissed due to the existence of another charge in another court or the existence of *Page 6 
a sentence imposed on prior offenses, then the triple count provision does not apply." State v. Davis, 7th Dist. No. 01 CA 171, 2002-Ohio-2789, at ¶ 18, citing State v.McDonald (1976), 48 Ohio St.2d 66, 357 N.E.2d 40. Thus, as of April 10, 2006, the State had 219 days (270 — 51 = 219) left to bring Carter to trial.
 {¶ 22} The clock ran again from May 15, 2006 until May 18, 2006 when Carter filed a motion to continue the trial set for May 23, 2006. On May 24, 2006, Carter filed another motion to continue on the same grounds. On May 25, 2006, the trial court rescheduled Carter's trial to May 31, 2006. The period of any continuance granted on the accused's own motion, tolls the speedy trial time. R.C. 2945.72(H); See, also, State v. Brown, 7th Dist. No. 03-MA-32, 2005-Ohio-2939, at ¶ 41. Thus, Carter's speedy trial time was tolled during this period. Id. At this point, 54 of the 270 speedy trial days accrued.
 {¶ 23} On June 1, 2006, the trial court sua sponte continued the trial to June 5, 2006 due to the unavailability of the court being engaged in a different jury trial. Thus, the clock was tolled during this period because a continuance issued by the trial court due to involvement in another criminal trial tolls the running of the speedy trial time. State v. McCall,152 Ohio App.3d 377, 2003-Ohio-1603, 787 N.E.2d 1241, at ¶ 23. 55 of 270 speedy trial days accrued.
 {¶ 24} The clock ran until June 7, 2006 when Carter filed another continuance. The trial court rescheduled the trial for June 14, 2006. At this point, 57 of 270 speedy trial days accrued.
 {¶ 25} On June 16, 2006, the trial court sua sponte rescheduled Carter's trial to June 26, 2006 due to unavailability of the court being engaged in a jury trial. 59 of 270 speedy trial days were then accrued.
 {¶ 26} On June 22, 2006, Carter filed his response to the State's request for discovery, which was filed on March 28, 2006 by the State. The period between the State's request for reciprocal discovery and the defendant's response totaled 87 days. InState v. Palmer,112 Ohio St.3d 457, 2007-Ohio-374, 860 N.E.2d 1011, paragraph one of the syllabus, the Ohio Supreme Court held that a defendant's *Page 7 
failure to respond within a reasonable time to a prosecution request for reciprocal discovery constitutes neglect that tolls the running of speedy trial time pursuant to R.C. 2945.72(D). The Court found that this is not dependent upon the filing of a motion to compel discovery by the prosecution. Id. at paragraph two of the syllabus. In addition, the Ohio Supreme Court held that a trial court shall determine the date by which the defendant should reasonably respond to a reciprocal discovery request based on the totality of facts and circumstances of the case, including the time established for response by local rule, if applicable. Id. at paragraph three of the syllabus.
 {¶ 27} In Palmer, supra, the Ohio Supreme Court found that the defendant's response to the State's reciprocal discovery request could have been prepared much earlier than 60 days after the State's request, and thus, the trial court did not abuse its discretion in tolling the running of statutory speedy trial time after 30 days had passed from service of the State's request. Id. at ¶ 23. Thus, in denying Carter's motion to dismiss based on speedy trial time, if the trial court considered the 87 days that passed between the State's reciprocal discovery request and Carter's response to that request, the trial court would likely have been within its discretion to charge some portion of this period of time against Carter. See, also, Williams, supra, at ¶¶ 28-38. It is also important to note that neither Carter nor the State has raised this discovery tolling issue. However, inWilliams, supra, this court said that "[u]pon review of a speedy-trial issue, a court is required to count the days of delay chargeable to either side and determine whether the case was tried within the applicable time limits." Id. at ¶ 37, quotingState v. Hart, 7th Dist. No. 06 CO 62, 2007-Ohio-3404 at ¶ 18, citing State v.Sanchez,110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, at ¶ 8. See, also, State v. McCall, supra, at ¶ 9.
 {¶ 28} Subsequently, on June 28, 2006, Carter executed a limited waiver of his right to a speedy trial for a 90-day period. That same day, the trial court granted Carter's motion and continued the jury trial to September 25, 2006, thus tolling the *Page 8 
clock for 90 days. If the 87-day time period regarding reciprocal discovery is completely overlooked, only 59 of 270 days had accrued at this point.
 {¶ 29} Additionally, regardless of whether Carter consented to the continuances and time waivers filed by his counsel, the Ohio Supreme Court has held that the right to trial within the time limits set forth in R.C. 2945.71 can be waived by defense counsel for reasons of trial preparation, and the defendant is bound by the waiver even if the waiver was made without his consent. State v.McBreen (1978),54 Ohio St.2d 315, 320, 8 O.O.3d 302, 376 N.E.2d 593, syllabus.
 {¶ 30} The record is silent as to why the trial court continued the September 25, 2006 jury trial to November 13, 2006. On November 9, 2006, Carter moved to dismiss the indictment on speedy trial grounds. The motion was a tolling event under R.C. 2945.72(E). Williams, supra at ¶ 25; See, also,State v. Broughton (1991),62 Ohio St.3d 253, 261-262, 581 N.E.2d 541; State v.Bickerstaff (1984),10 Ohio St.3d 62, 67, 10 OBR 352, 461 N.E.2d 892; State v.Martin (1978),56 Ohio St.2d 289, 297, 10 O.O.3d 415, 384 N.E.2d 239. The State opposed this motion in a memorandum filed on November 9, 2006. The record does not reflect whether the trial court held a hearing on Carter's motion to dismiss. However, on November 9, 2006, the trial court sua sponte continued a pretrial set in this case for November 1, 2006 due to the unavailability of the trial court being engaged in another jury trial, and ordered the November 13, 2006 jury trial.
 {¶ 31} In spite of the trial court's failure to supplement the record regarding the continuance of the September 25, 2006 trial date, as of November 9, 2006, only 104 total days had accrued of the 270 available speedy trial days.
 {¶ 32} On November 13, 2006, the voir dire part of trial commenced. By this date, only 104 of 270 speedy trial days had accrued. Thus, the trial court properly denied Carter's motion to dismiss. This calculation also excludes any portion of the 87-day delay Carter caused in responding to the State's reciprocal request for discovery information. For the foregoing reasons, Carter's speedy trial right was not violated as only 104 days had passed. *Page 9 
 {¶ 33} Accordingly, Carter's first assignment of error is without merit.
 {¶ 34} Carter's second assignment of error alleges:
 {¶ 35} "THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT PERMITTED APPELLEE TO USE EVIDENCE OF APPELLANT'S POST-MIRANDA SILENCE IN ITS CASE-IN-CHIEF AND SUMMATION CONTRARY TO THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION."
 {¶ 36} Carter argues that the State improperly elicited testimony regarding his post-Miranda silence as evidence of his guilt during the State's direct examination of Detective John Kelty of the Youngstown Police Department, and that the issue of his post-Miranda silence was "at the center" of the State's closing argument, in violation of his right to remain silent as stated inMiranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Carter also relies onDoyle v. Ohio (1976),426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, in support of his assertions that it is "fundamentally unfair, and a violation of the Due Process Clause" for the State to use his silence against him to prove his guilt. Carter acknowledges that trial counsel failed to object to these various questions and answers during trial. Thus, Carter has waived review of this assignment of error but for plain error under Crim. R. 52(B).
 {¶ 37} Carter references the following dialogue from the State's case-in-chief in support of his argument that the State improperly referenced Carter's silence as evidence of his guilt. In the following dialogue, Detective Kelty testifies about when Carter gave his third statement on March 10, 2006, the date of his arrest. (Trial Tr. 610.) At this time, Detective Kelty provided Carter with his rights, and Carter signed the rights waiver form twice. (Tr. 611.) On direct examination, the State questioned Detective Kelty as follows:
 {¶ 38} "Q: Did you confront him with the facts of the case?
 {¶ 39} "A: I did again, yes.
 {¶ 40} "Q: Did you tell him what you believed happened?
 {¶ 41} "A: I did. *Page 10 
 {¶ 42} "Q: And as you're showing him these things, are you accusing him of murdering Jamie White?
 {¶ 43} "A: I am.
 {¶ 44} "Q: What did he say or do when you made this accusation?
 {¶ 45} "A: Nothing.
 {¶ 46} "Q: Nothing?
 {¶ 47} "A: Nothing.
 {¶ 48} "Q: He didn't try to deny it, he didn't-
 {¶ 49} "A: He did not deny it. He didn't show any emotion.
 {¶ 50} "Q: Did he cry?
 {¶ 51} "A: Just sat there cool and calm.
 {¶ 52} "Q: Did he cry?
 {¶ 53} "A: No.
 {¶ 54} "Q: Did he say, I didn't do this?
 {¶ 55} "A: He did not.
 {¶ 56} "Q: Did he try to take a swing at you?
 {¶ 57} "A: No.
 {¶ 58} "Q: So you're confronting him with these photographs, with the facts of this case, with the fact that no one is verifying his alibi, you're accusing him of murdering his girlfriend, and he's showing no response whatsoever?
 {¶ 59} "A: That's correct." (Tr. 612-613.)
 {¶ 60} Carter also objects to the following issues derived from the State's closing argument. Carter asserts that the State "attacked [his] trial testimony by pointing out that he had not given the same information to the police when he was interrogated." Carter also asserts that the State argued to the jury that his testimony was not credible based on his failure to provide information to the police about various circumstances. Carter says that the State's focus on these various omissions of information was improper since he had been advised of his right to remain silent *Page 11 
during police interviews, and because the State was trying to persuade the jury to infer his silence was evidence of his guilt at trial.
 {¶ 61} Specifically, Carter cites, in part, to the following excerpts from the State's closing argument:
 {¶ 62} "MR. DESMOND: As I was stating, he's a convicted felon, convicted of domestic violence, who's on trial for the murder of his current girlfriend. He wants you to take his word over everybody else's. So let's look at his word. Let's look at his versions of events. When I say `versions,' I mean versions, multiple inconsistent versions.
 {¶ 63} "First statement: He claims he was in Warren with [White] three to four days prior to December 31st. Never told police that. The first time we heard it was from the witness stand, inconsistency. Second, he claimed he was driving [Anthony Watkins's] Lumina on December 31st, 2005, that he gave it back to him later in the day and then that's when he went home and got this tan van from his grandfather. Again, guess when the first time we heard this was? From the witness stand. He was interviewed three times by the police. He never thought it would be important to say what happened that day, the prior days, the days leading up to it. He never mentions any of this. He's accused of murdering his girlfriend and he leaves out vital facts? No. These aren't facts. These are make believe." (Tr. 792-793.)
 {¶ 64} Carter also protests two other similar comments made by the State in its closing argument. (See Tr. 799, 802.)
 {¶ 65} In response, the State argues that since trial counsel did not object to the testimony at issue in this case, Carter waived the right to raise the issue on appeal, citingState v. Williams (1977),51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, at paragraph one of the syllabus. The State further argues that it did not use Carter's silence after his arrest and his receipt of Miranda warnings to impeach him, which would be a violation of the Due Process Clause of the Fourteenth Amendment, or to penalize Carter for remaining silent. Instead, the State asserts that Carter himself put his silence into question "by testimony or other acts that stand `in direct *Page 12 
contradiction to silence.'" In support of this premise, the State asserts that Carter quoted the State's direct questioning of detective Kelty out of context because the State actually used Carter's silence to "demonstrate that Carter was cold and calculating, not that his silence was indicative of his guilt." The State also asserts that "Carter's testimony at trial stood in direct contradiction to his silence" when he "affirmatively denied any involvement in the offense, and directly denied that he ever remained silent." (See Tr. 760.) The State says that Carter's responses in the referenced pages of the trial transcript reveal that Carter was not actually silent when he denied involvement in White's death, and even if there were an issue of silence, trial counsel "opened the door by discussing it at length."
 {¶ 66} It is important to note that although Carter cites toDoyle in support of his arguments, he does not complain of the State's behavior during cross-examination. Instead, Carter focuses on the State's direct examination of Detective Kelty and the State's comments during closing argument.
 {¶ 67} In Doyle, the United States Supreme Court held that post-Miranda silence may not be used against a criminal defendant where the defendant's silence was induced byMiranda warnings. Doyle,426 U.S. at 619, 96 S.Ct. 2240. Specifically, the Court stated, "We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda
warnings, violated the Due Process Clause of theFourteenth Amendment." Id. In Doyle, the defendants' Miranda
advisements were immediately followed by the defendants' silence; there was no intervening waiver of rights and/or police questioning.Doyle observed, "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings.In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to *Page 13 
impeach an explanation subsequently offered at trial." (Emphasis added; Citations and footnotes omitted.) Id. at 617-618.Doyle holds that the prosecution may not, consistent with due process and fundamental fairness, use postarrest silence followingMiranda warnings to impeach a defendant's testimony at trial.
 {¶ 68} However, it is crucial to note that a suspect may waive the right to remain silent. Miranda v.Arizona (1966),384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694. Doyle does not support Carter's position, because Carter waived hisMiranda rights and made statements to the police, whereas inDoyle, there was no Miranda waiver. In other words, this is not a Doyle case because "a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent." Anderson v. Charles (1980),447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222. The Ohio Supreme Court noted that Doyle emphasized the unfairness of inviting a defendant to rely on the Miranda warnings' implied promise that his silence cannot be used against him, and then, in fact, using his silence against him. State v. Osborne (1977),50 Ohio St.2d 211, 4 O.O.3d 406, 364 N.E.2d 216, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1155. It added that a defendant who chooses to talk has not relied on that promise with respect to what they talk about. "If a defendant voluntarily offers information to police, his toying with the authorities by allegedly telling only part of his story is certainly not protected by Miranda or Doyle." Osborne,50 Ohio St.2d at 216, 4 O.O.3d 406, 364 N.E.2d 216. See, also,State v. Gillard (1988),40 Ohio St.3d 226, 533 N.E.2d 272, certiorari denied byGillard v. Ohio (1989),492 U.S. 925, 109 S.Ct. 3263, 106 L.Ed.2d 608; State v.Jenkins (Mar. 14, 2000), 7th Dist. No. 98-502 CA (finding that when a criminal defendant voluntarily chooses to make a statement, it cannot be held that he was exercising his right to remain silent).
 {¶ 69} Relying on Osborne and Gillard, the Eighth District Court of Appeals has specifically held that "it is not error, when a defendant has spoken after receiving hisMiranda rights, for the police to comment on the defendant's refusal to continue speaking." State v. Garltic, 8th Dist. No. 90128, 2008-Ohio-4575, at ¶ 32. Federal *Page 14 
courts are in accord. U.S. v. Andújar-Basco (C.A.1, 2007),488 F.3d 549, 555 ("As a general rule, any inculpatory or exculpatory statements made by a defendant (including silence with regard to particular questions) are admissible at trial insofar as they were the product of a knowing and voluntary waiver.");U.S. v. Burns (C.A.8, 2002), 276 F.3d 439, 442 ("[W]here the accused initially waives his or her right to remain silent and agrees to questioning, but `subsequently refuses to answer further questions, the prosecution may note the refusal because it now constitutes part of an otherwise admissible conversation between the police and the accused.'" (citation omitted)); Scillion v.O'Dea (C.A.6, 1994) 16 F.3d 1221 (comment on defendant's refusal to answer questions after waiving his right to remain silent was not improper); Rowan v. Owens, 752 F.2d 1186, 1190 (C.A.7, 1984), cert. denied, 476 U .S. 1140, 90 L.Ed.2d 691 (1986) (holding that because the defendant waived his Miranda rights, it was permissible for police to testify to any incriminating statements the defendant made as well as to his indication that he did not want to answer any further questions, and this testimony did not invite the jury to infer the defendant must therefore be guilty).
 {¶ 70} As already indicated, Doyle does not support Carter's position in this case. Carter waived his Miranda
rights and made statements to the police, whereas in Doyle, there was no Miranda waiver. Carter signed a rights waiver form prior to giving his March 10, 2006 statement, which the State and Detective Kelty referred to on direct examination. Carter made no claim at trial that his statements were made in the absence of an intelligent waiver. Following his waiver of rights, he voluntarily answered numerous questions about the circumstances surrounding the van. When asked about the murder itself, Carter never revoked his rights waiver or invoked his right to remain silent and was simply unresponsive. "It is well established that the refusal to answer certain questions is not the equivalent of a rescission of a previously given waiver of Miranda rights."State v. House (1978),54 Ohio St.2d 297, 299-300, 376 N.E.2d 588, 8 O.O.3d 292. Consequently,Doyle is inapplicable and the state was permitted to comment on Carter's unresponsiveness. *Page 15 
 {¶ 71} Accordingly, for the foregoing reasons, Carter's second assignment of error is without merit.
 {¶ 72} Carter's third assignment of error alleges:
 {¶ 73} "INSTANCES OF PROSECUTORIAL MISCONDUCT THROUGHOUT THE COURSE OF APPELLANT'S CRIMINAL TRIAL DEPRIVED HIM OF HIS RIGHT TO A FAIR TRIAL."
 {¶ 74} Carter asserts that the State misrepresented evidence, improperly commented on the credibility of witnesses, and made statements that went beyond the record, thus he should be afforded a new trial. Carter also states that the State improperly characterized the defense in derogatory terms; however, he never explains this. The State contends that the prosecution's conduct was normal and within "regular exercises of rhetoric and trial strategy."
 {¶ 75} The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial.State v. Fears (1999),86 Ohio St.3d 329, 332, 715 N.E.2d 136. In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected substantial rights of the appellant. State v. Smith (1984),14 Ohio St.3d 13, 14, 470 N.E.2d 883. "[T]he touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v. Hanna,95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, at ¶ 61, quotingSmith v. Phillips (1982),455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. State v. LaMar,95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 121. A failure to object to alleged prosecutorial misconduct waives all but plain error. Hanna, at ¶ 77; LaMar, at ¶ 126.
 {¶ 76} Carter did not specifically object to many of the matters he now claims as error on appeal. Those questions not objected to are reviewed under the plain error standard found in Crim. R. 52(B). *Page 16 
 {¶ 77} Carter presents various instances of alleged prosecutorial misconduct. First, he complains that the State improperly informed the jury during opening statements that the trial is held for the purpose of "convicting" him. (Tr. 260.) However, trial counsel objected to this statement, and the trial court sustained this objection and immediately gave a curative instruction to the jury. Id. Carter also complains of a question the State improperly asked of witness Linda Laihr (Laihr). Trial counsel also objected to this question and the trial court sustained the objection. (Tr. 291-292.) Carter does not explain how either of these instances prejudiced him.
 {¶ 78} Next, Carter finds fault with the State's behavior during closing argument. "When reviewing the statements a prosecutor makes during closing argument for prosecutorial misconduct, the Ohio Supreme Court has instructed appellate courts to give prosecutors `a certain degree of latitude in summation. The prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument. We view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial.'" State v.Carter, 7th Dist. No. 05 JE 7, 2007-Ohio-3502, at ¶ 43, quoting State v.Treesh (2001), 90 Ohio St.3d 460, 466, 739 N.E.2d 749.
 {¶ 79} Carter alleges that "[t]hroughout his closing argument, the prosecutor manipulated and misstated the evidence." In support, Carter argues that the State improperly characterized Michele's testimony regarding Carter's return to her house on December 31, 2005 as a "`play on words.'" Michele appeared as a witness for the State, however, during trial she testified to three different accounts of whether Carter returned to her home, and the trial court granted the State's oral motion to treat Michele as a hostile witness. (Tr. 299-300, 306-308, 310, 327.) In closing, the State commented on Michele's inconsistent testimony by stating "[Michele] took the stand and she tried to make a play on words as to whether she said [Carter and White] returned or [Carter alone] returned, * * *." (Tr. 775-776.) Pursuant to Treesh, supra, and based on the record, the State did not mischaracterize Michele's inconsistent testimony. *Page 17 
 {¶ 80} Carter then argues that during closing the State improperly commented on the credibility of the following State's witnesses: Laihr, Mark Ortello (Mark), Denise Watkins (Denise), Jalaina Mattison (Jalaina), Michele, and Ricky Paige (Paige). Carter maintains the State also accused Michele and Paige of being false alibi witnesses. Carter does not state why or how the State's comments were improper. In closing, the State re-capped testimony from almost every witness, and explained to the jury the witnesses could be considered credible because "[t]hey corroborate each other; they corroborate the other witnesses." (Tr. 773-787, 789, 823-824.) The only witnesses that the State did not include in this re-cap are Youngstown Police Department Officer Robert Mauldin, Chad Britton and Brenda Gerardi of BCI, and Ed Carter, Carter's grandfather. When discussing Michele and Paige, the State attempted to illustrate to the jury that Carter's testimony is not credible because these people do not vouch for him as alibis should. (Tr. 793-795.) Interestingly, during closing, Carter's trial counsel proceeded through a similar accounting as to why particular witnesses should or should not be considered credible by the jury. (Tr. 818-819.) This court has found that "a prosecutor may argue that certain evidence tends to make a witness more or less credible, but may not state his own belief as to whether a witness is telling the truth."State v. Rector, 7th Dist. No. 01 AP 758, 2002-Ohio-7442, at ¶ 52, citing State v.Carpenter (1996),116 Ohio App.3d 615, 624, 688 N.E.2d 1090. Here, the State continually referred to evidence contained within the record when discussing witness credibility.
 {¶ 81} Carter also argues against other comments made by the State during closing that trial counsel objected to and the trial court sustained, such as the State's challenge of Carter's "plausible theory" that Watkins committed the murder. (Tr. 790, 820, 825.)
 {¶ 82} "MR. DESMOND: Plausible theory. Translation, I'm trying to force reasonable doubt on you. * * * He's saying, well, I have no evidence that [Watkins] did it so guess what I'm going to do, I'm going to accuse him anyway. Why the hell won't I? I can accuse whoever I want because I'm on trial for murder so I might as *Page 18 
well accuse someone." (Tr. 820.) At this time, trial counsel objected and the trial court sustained the objection. Id.
 {¶ 83} "MR. DESMOND: Anthony Watkins, plausible theory. No, ladies and gentlemen, that's just another attempt by the defense to — ." (Tr. 825.) Before the State completed the sentence, trial counsel objected and the trial court sustained the objection. (Tr. 825-826.)
 {¶ 84} Carter has once again failed to demonstrate that he suffered prejudice from the prosecutor's comments, which were objected to and sustained.
 {¶ 85} Additionally, Carter asserts that the State improperly made statements that went beyond the record and were unsubstantiated by the evidence. In support, Carter says that the State inappropriately commented during closing argument "that [Carter] killed [White] and knew she was dead on [January 1, 2006], when he asked the Ortello brothers to crush the van." The record reveals that the State's comments were based on Mark's testimony, in part. (Tr. 779.) The State said "[n]o one knew [White] was dead until [January 2, 2006], but yet [Carter] knew she was dead because he killed her, and that's why on [January 1, 2006] he asked the brothers, the Ortello brothers [Mark and Marvin], to crush the van." Id. Thus, the State derived this conclusion from the testimonial evidence.
 {¶ 86} "Despite the fact that prosecutors are encouraged to argue fervently for conviction * * *, a prosecutor cannot go beyond the evidence which is before the jury when arguing for a conviction." Carter, supra, at ¶ 44, citing State v.Smith (1984), 14 Ohio St.3d 13, 13-14, 470 N.E.2d 883. However, this court has held that "a prosecutor is permitted to make reasonable inferences from the evidence and many * * * instances are nothing more than inferences from the evidence." Id. at ¶ 46; see, also, Treesh at 466. For instance, in Carter, the prosecutor told the jury, "I know what happened in this case," and then explained that he and the jury knew what happened because they had all heard the testimony. Thus, this court determined that the prosecutor's statement was an inference based on the evidence. Additionally, in Carter, the prosecutor referred to the appellant as someone who kills people. This *Page 19 
court found that "this statement does not indicate that the prosecutor has knowledge of facts outside the record. Instead, it shows that he reached this conclusion based on the evidence in this case." Id. at ¶ 47.
 {¶ 87} Carter also objects to the State's explanation of why it would have been impossible for Watkins to have killed White. (Tr. 785-787.) It appears that the State is introducing its own theory as to this impossibility, based on testimony given by Denise and her sister-in-law, Marla Bryner. Id. This is not unlike Carter's introduction of his theory that Watkins killed White. (Tr. 812-817, 819.) Further, it appears that the State merely based their explanation on the evidence contained in the record. SeeCarter, supra.
 {¶ 88} Carter asserts that the State improperly mischaracterizes a January 10, 2006 incident when he said there was an "argument outside, people are holding clubs, people are holding tire irons." (Tr. 788.) However, on direct examination, Mark testified about this same incident and said "* * * they just hollering all type of stuff like, you know, got bats and clubs in their hands * * *." (Tr. 430.) Clearly, the State did not err significantly in its description of the January 10, 2006 argument. Therefore, it is difficult to understand how the State's mistaken use of "tire iron" rather than "club" prejudiced Carter.
 {¶ 89} Carter also argues the State misstated that Carter testified he drove around looking for White on the night of December 31, 2005. (Tr. 797.) Upon reviewing the record, it is evident that Carter never stated this. (Tr. 708-763.) However, trial counsel objected and the trial court sustained the objection. (Tr. 797.) Even if the prosecutor's remark is considered misconduct, it lacks prejudicial effect warranting reversal because the court sustained Carter's objection. See State v. Noling,98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 94.
 {¶ 90} Finally, Carter briefly states that the State "engaged in improper testimony and behavior during trial when he elicited testimony of [Carter's] post-Miranda silence * * *." This issue was reviewed extensively in assignment of error number two. *Page 20 
 {¶ 91} Pursuant to Treesh, supra, the few improper statements made by the prosecutor during closing argument did not permeate the State's argument so as to deny Carter a fair trial. See, also, State v. Bey (1999),85 Ohio St.3d 487, 495, 709 N.E.2d 484. Further, the trial court sustained each of defense counsel's objections in the instances referenced herein.
 {¶ 92} Additionally, the trial court's instructions also negated any potential prejudice arising from improprieties in the prosecutor's argument. The court instructed the jury on the presumption of innocence, the state's burden of proof, and reasonable doubt. It further instructed the jurors that counsel's statements, counsel's arguments, and stricken statements were not evidence and cautioned them not to speculate on an unanswered question or why an objection was sustained. In sum, the State's behavior did not affect Carter's substantial rights and, thus, prejudicial error did not result.
 {¶ 93} Accordingly, Carter's third assignment of error is without merit.
 {¶ 94} Carter's fourth assignment of error alleges:
 {¶ 95} "THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN APPELLANT'S TRIAL COUNSEL FAILED TO OBJECT TO THE APPELLEE'S USE OF APPELLANT'S POST-MIRANDA SILENCE AS EVIDENCE OF GUILT AND FOR FAILING TO OBJECT TO NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT."
 {¶ 96} Carter argues his trial counsel was ineffective in relation to the matters discussed in assignments of error two and three.
 {¶ 97} In order to prove ineffective assistance of counsel, appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance was deficient, and second, the deficient performance prejudiced the defense. Strickland v.Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v.Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Even if counsel's performance is considered deficient, a conviction cannot *Page 21 
be reversed absent a determination that appellant was prejudiced.State v. Dickinson, 7th Dist. No. 03 CO 52, 2004-Ohio-6373, at ¶ 13, citingBradley, 42 Ohio St.3d at 142, 538 N.E.2d 373. To show that he has been prejudiced by trial counsel's deficient performance, appellant must prove that there is a reasonable probability that but for counsel's serious error, the result of the trial would have been different. Id., citing State v. Baker, 7th Dist. No. 03 CO 24, 2003-Ohio-7008, at ¶ 13; State v.Keith (1997), 79 Ohio St.3d 514, 534, 684 N.E.2d 47.
 {¶ 98} A court deciding an ineffective assistance claim does not need to "approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland,466 U.S. at 697, 104 S.Ct. 2052, 80 L.Ed.2d 674. Further, the appellant must affirmatively prove the alleged prejudice occurred. Id. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674. Otherwise, any act or omission of counsel would satisfy the test. Id.
 {¶ 99} Appellant bears the burden of proof on the issue of counsel's effectiveness, and in Ohio, a licensed attorney is presumed competent. State v. Carter (June 29, 2001), 7th Dist. No. 2000-CO-32, citing State v. Calhoun (1999),86 Ohio St.3d 279, 289, 714 N.E.2d 905. Furthermore, "strategic or tactical decisions will not form a basis for a claim of ineffective assistance of counsel." Dickinson at ¶ 11, citing State v.Clayton (1980),62 Ohio St.2d 45, 48-49, 16 O.O.3d 35, 402 N.E.2d 1189.
 {¶ 100} In Dickinson, this court stated "[e]ffectiveness is, `not defined in terms of the best available practice, but rather should be viewed in terms of the choices made by counsel.'" Id. at ¶ 12, quoting State v. Wilkins (1980),64 Ohio St.2d 382, 390, 18 O.O.3d 528, 415 N.E.2d 303. This court urged that the reasonableness of the attorney's decisions must be assessed at the time the decisions are made, and not at the time of assessment. Id., citing Wilkins,64 Ohio St.2d at 390, 18 O.O.3d 528, 415 N.E.2d 303.
 {¶ 101} Carter argues he was denied effective assistance of counsel when his trial counsel failed to object to the State's use of Carter's post-Miranda silence as set *Page 22 
forth in assignment of error number two. Carter argues for the proposition that "[m]ultiple instances of ineptitude including failures to object and provide improper legal advice amount to a denial of effective assistance of counsel." Citing State v.Huff (2001), 145 Ohio App.3d 555, 763 N.E.2d 95. He then asserts that based on his brief discussion, and the various case law set forth in assignments of error two and three relating to trial counsel's failure to adequately protect his statutory and constitutional rights and adequate representation, his conviction and sentence should be vacated and this matter returned to the trial court for a new trial.
 {¶ 102} Carter completely fails to explain how counsel's performance during trial prejudiced him. Further, the case law Carter discusses under assignment of error number two relates to a prosecutor's improper reference to an accused's silence. The only mention of trial counsel's failure to object to questions and comments made by the State relates to his argument that assignment number two should be reviewed pursuant to the plain error doctrine of Crim. R. 52(B). Additionally, Carter only discusses prosecutorial misconduct in assignment number three.
 {¶ 103} This court can only infer that Carter is referring to his complaints of the State's questioning of Detective Kelty in its case-in-chief, and comments made during closing argument. Carter waived his right to remain silent and was not prejudiced by trial counsel's failure to object to the testimony of Detective Kelty. During the State's closing argument, trial counsel entered objections to four different statements made by the State. (Tr. 790, 792, 797, 801.) The trial court sustained two of these objections, overruled one objection, and trial counsel himself withdrew the final objection. Id. During the State's rebuttal argument, trial counsel entered objections eight different times. (Tr. 820-822, 824-827.) The trial court sustained three and overruled five of trial counsel's objections. Id.
 {¶ 104} In the present case, counsel's representation did not fall below an objective standard of reasonableness, nor is there a reasonable probability that but for counsel's alleged unprofessional errors, the result of the trial would have been different. The record shows that trial counsel submitted the testimony of two *Page 23 
witnesses on Carter's behalf, in addition to Carter himself. All of these witnesses buttressed trial counsel's strategy. Trial counsel also presented to the jury an alternate theory as to who killed White. (Tr. 812-817, 819.)
 {¶ 105} Viewing the record as a whole, it does not show that counsel breached any duty owed to appellant nor that, but for the alleged errors, the outcome of the trial would have been different. Accordingly, Carter's fourth assignment of error is without merit.
 {¶ 106} Carter's fifth assignment of error alleges:
 {¶ 107} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THE FOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTION FOR MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."
 {¶ 108} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541. "Weight of the evidence concerns `the inclination of the greater amount of credibleevidence, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) Id. In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390, 678 N.E.2d 541. "To reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Id. at paragraph four of the syllabus (construing and applying Section 3(B)(3), Article IV of the Ohio Constitution). *Page 24 
 {¶ 109} Carter challenges his conviction for murder under R.C. 2903.02(A), which provides:
 {¶ 110} "(A) No person shall purposely cause the death of another * * *."
 {¶ 111} Carter argues that the evidence adduced at trial failed to establish the State's theory that he murdered White. In support of this contention, Carter argues that the State failed to produce a witness who could actually identify Carter as the perpetrator of White's murder, and only offered evidence that "blood from Jamie White was found in the burgundy and gray van that was purportedly owned by [Carter] and driven by him on the night of the murder."
 {¶ 112} Carter then criticized the "contradictory" testimony presented at trial concerning whether Carter sold the burgundy and gray van to another party, Watkins, who died prior to trial and obviously could not testify as to this conflict. Other "contradictory" testimony cited relates to that given by several of Carter's family members and a friend concerning his return to the family New Year's Eve party that he and White attended together earlier that evening. The circumstances related to the party are significant because after White departed from this party she was never again seen alive.
 {¶ 113} Carter continues, "[t]he only evidence which remotely tied [him] to this alleged crime was the burgundy and gray van, its questionable ownership and the [State's] improper use of post Miranda silence * * * to infer his guilt to the jury." Thus, Carter asserts, the guilty verdict should not stand because there was "a lack of witness testimony" connecting him to White's murder, and the evidence presented was inconclusive.
 {¶ 114} Contrary to Carter's arguments, there is evidence supporting the jury's verdict, and there certainly was not a lack of witness testimony connecting him to the murder. Witness Laihr, White's best friend and occasional roommate, testified that Carter picked up White from Laihr's apartment on December 31, 2005, in the same burgundy and gray van she had seen him in before to take White to a party. (Tr. 278, 281-285.) Laihr testified that White returned to the apartment very upset after an *Page 25 
argument she had with Carter. (Tr. 286-287.) After White calmed down, Laihr drove her back to the New Year's party on Midlothian Boulevard in Youngstown and noticed the burgundy and gray van parked at the party. (Tr. 287-288.) Laihr testified that she never saw White again after dropping her off at the party. (Tr. 288.)
 {¶ 115} Michele, stepmother of Carter, testified that she hosted the New Year's Eve party at her home on Midlothian Boulevard that both Carter and White attended. (Tr. 294-295.) Michele did not see the couple argue at the party, but did corroborate other testimony given by Laihr. (Tr. 295-296.) Michele confirmed that Carter drove the burgundy and gray van on December 31, 2005. (Tr. 297.) Michele also testified that the couple left the party a second time later in the evening, sometime after 10:30 P.M. (Tr. 296-297.) When questioned about whether Carter returned to the party after this departure, she told several different versions relating to whether Carter did or did not return to her party on December 31, 2005. (Tr. 299-300, 306-308, 310.) Ultimately, the court allowed the State's motion to treat Michele as a hostile witness. (Tr. 327.)
 {¶ 116} Jalaina, nineteen year old stepsister of Carter, corroborated testimony given by both Laihr and Michele. (Tr. 314-316.) Jalaina confirmed that the couple left the party later in the evening and that Carter drove the burgundy and gray van. (Tr. 317-318.) Jalaina also testified that neither Carter nor White returned to the party that night. (Tr. 318.)
 {¶ 117} Scott Grope testified to locating White's body early the next morning on Salt Springs Road in Youngstown. (Tr. 343-344.) Officer Mosca of the Youngstown Police Department testified to responding to a 911 call reporting a body located near Salt Springs Road around 9:30 A.M. on January 1, 2006. Mahoning County Deputy Coroner Dr. Robert C. Belding testified to his findings in the autopsy he performed on White. (Tr. 365, 370-404.) He also explained in detail the various wounds White suffered as a result of being stabbed multiple times, and as a result of her throat being slashed. (Tr. 370-404.) *Page 26 
 {¶ 118} Mark, cousin of Carter, testified that he was with Carter on January 1, 2006 and that Carter asked him to "crush" the burgundy and gray van to destroy it. (Tr. 416-417.) Mark testified that on January 1, 2006, Carter commented that "he didn't want no more memories [of White or the van]." (Tr. 416, 432, 439-440.) However, the record reveals that police did not identify White's body until January 2, 2006. (Tr. 410.) Mark also testified that Carter gave him the keys and title to the van, but that he did not crush the van as instructed. (Tr. 418, 423.) Instead, Mark explained that he gave the van to Watkins, who died before trial. (Tr. 422, 425.) Mark also said that he instructed his brother Marvin Ortello (Marvin) to wipe the van down to remove their fingerprints. (Tr. 421.) Mark then explained that Carter wanted the van back, so they attempted to strip the steering column to hot-wire the van to remove it from Watkins's home because Watkins said he did not have the keys. (Tr. 423-427.) Mark confirms that in spite of the confusion surrounding the van, Carter still wanted to get the van back from Watkins to crush it. (Tr. 429, 434-435.)
 {¶ 119} Marvin, cousin/family friend of Carter's, testified that he saw Carter driving the burgundy and gray van the morning of January 1, 2006. (Tr. 445-447.) Marvin corroborated Mark's testimony regarding destroying the van and wiping it down to remove their fingerprints. (Tr. 449-450, 455-456.) Marvin also testified that he noticed a dark purplish color stain in the front seat of the van and on the floor of the driver's side of the van. (Tr. 451-452.)
 {¶ 120} Brenda Gerardi (Gerardi) of the Attorney General's Office, BCI, testified to her analysis of the DNA taken from the windshield of the van and compared it to a sample from White. (Tr. 570.) Gerardi's analysis concluded that the blood from the windshield belonged to White. (Tr. 572.) Testimony was also given by nine other witnesses, including Officer Robert Mauldin of the Youngstown Police Department crime lab; Chad Britton of BCI; Youngstown Police Department Detective John Kelty; and finally, Carter himself.
 {¶ 121} Carter essentially argues that the testimony presented in this case is not credible, or at least that it does not support the murder conviction. However, *Page 27 
"Judging the credibility of testimony is primarily the responsibility of the jury." State v. High (2001),143 Ohio App.3d 232, 253-254, 757 N.E.2d 1176, citing State v.DeHass (1967),10 Ohio St.2d 230, 231, 227 N.E.2d 212, 39 O.O.2d 366. "Therefore we must accede to the jury who `is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" Id., quoting State v. Gore (1999),131 Ohio App.3d 197, 201, 722 N.E.2d 125, quoting Seasons CoalCo., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. Similar to the appellant in High, Carter focuses on inferences that he hoped the jury would derive from the testimony presented at trial. SeeHigh, supra.
 {¶ 122} Carter also chooses to focus on the fact that no one actually identified him as the perpetrator of White's murder, and that "contradictions" existed in testimony. However, this court has stated "[t]he fact that there was conflicting evidence * * * does not mean that the jury could not have found Appellant guilty of murder. Furthermore, circumstantial evidence possesses the same probative value as direct evidence, and there is no separate standard of review for circumstantial evidence." State v.Smith, 7th Dist. No. 06 BE 22, 2008-Ohio-1670, at ¶ 49, citing State v.Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. Evidence supporting the verdict may be found solely through circumstantial evidence. Id.
 {¶ 123} In State v. Nicely (1988),39 Ohio St.3d 147, 529 N.E.2d 1236, the Supreme Court of Ohio considered the issue of whether a conviction for murder may be supported wholly by circumstantial evidence. The Ohio Supreme Court ultimately held as follows:
 {¶ 124} "[W]e know of no reason that the crime of murder should be treated any differently from other crimes when considering the use of circumstantial evidence to establish their commission. Given the extensive precedent in Ohio on the use of circumstantial evidence to prove the commission of a crime and the abundant case law in other jurisdictions on the use of such evidence in homicide prosecutions, we *Page 28 
hold that in the absence of a human body, a confession, or other direct evidence of death, circumstantial evidence alone may be sufficient to support a conviction for murder." Id. at 154-155, 529 N.E.2d 1236.
 {¶ 125} Thus, Carter's arguments regarding the absence of direct evidence are unpersuasive. In spite of Carter's assertions, the record supports that a jury could rationally infer from the evidence presented at trial that Carter is guilty. Thus, Carter's conviction was not against the manifest weight of the evidence.
 {¶ 126} Accordingly, Carter's fifth assignment of error is without merit.
 {¶ 127} The judgment of the trial court is hereby affirmed.
Vukovich, P.J., concurs.
Waite, J., concurs. *Page 1